TODD KIM, Assistant Attorney General
Environment and Natural Resources Div.
United States Department of Justice
SAMUEL D. GOLLIS, Trial Attorney
Massachusetts BBO No. 561439
Indian Resources Section
Environment and Natural Resources Div.
United States Department of Justice
999 18th Street, South Terrace, Suited 370
Denver, CO 80202
Tel: (303) 844-1351
Fax: (303) 844-1350
Samuel.Gollis@usdoj.gov
CODY L.C. McBRIDE, Trial Attorney
California Bar No. 298099
Indian Resources Section
Environment and Natural Resources Div.
United States Department of Justice
4 Constitution Square, 150 M Street NE,
Room No. 3.1130
P.O Box 7611
Washington, D.C. 20044
Tel: (202) 514-6755
Fax: (202) 353-1156
Cody.McBride@usdoj.gov

JOSHUA D. HURWIT, Idaho Bar No. 9527
United States Attorney, District of Idaho
CHRISTINE ENGLAND,
Idaho Bar No. 11390
Assistant United States Attorney,
District of Idaho
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (208) 334-1211; Fax: (208) 334-9375
christine.england@usdoj.gov

*Attorneys for Plaintiff United States of America*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>UNION PACIFIC RAILROAD,<br><br>　　　　Defendant. | Case No. 4:24-cv-226<br><br>**COMPLAINT** |

The United States of America, pursuant to the authority of the Attorney General and at the request of the Secretary of the Interior, alleges as follows:

## NATURE OF THE ACTION

1. In July 1881, the Shoshone-Bannock Tribes of the Fort Hall Reservation ("Tribes") agreed to cede a portion of their Reservation to the United States, which then transferred the land to Defendant Union Pacific Railroad's ("UPR") predecessor for construction of a railway line. The agreement, ratified and confirmed by statute in 1882, defined the purposes and intended uses of the grant. Specifically, a part of the grant was intended to be used "as a right of way and road bed" and the other "for depots, stations, sidings, and so forth."

2. As early as 1936, UPR began leasing a portion of the part meant "for depots, stations, sidings, and so forth" located in Pocatello, Idaho ("Pocatello" or "City"), to third parties, including the City, for non-railroad uses. Those uses, which continue today, contravene the specific limitations imposed upon UPR's predecessors in the 1881 agreement and 1882 statute.

3. The United States brings this action to resolve the parties' dispute over UPR's misuse and abandonment of portions of the railroad right of way located in the City. The United States asserts, in its capacity as trustee for the Tribes, an action seeking a declaration that the United States holds title to the land in question in its name for the benefit of the Tribes, or, alternatively, on the United States' own behalf. The Unites States also seeks ejectment of UPR from the premises and damages based upon UPR's unlawful use and occupancy.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (Federal Question) and 1345 (United States as Plaintiff) because the action arises under the Constitution, treaties, and laws of the United States, and is brought by the United States.

5. The allegations of this Complaint give rise to an actual controversy within the meaning of 28 U.S.C. §§ 2201-2202 (Declaratory Judgments).

6.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the real property that is the subject of this action is situated in the judicial district and most, if not all, of the events giving rise to this action occurred there.

## PARTIES

7.  Plaintiff is the United States of America, suing on its own behalf in its sovereign governmental capacity and in its capacity as trustee for the Tribes, to enforce the Tribes' property rights.

8.  The Shoshone-Bannock Tribes of the Fort Hall Reservation is an Indian Tribe recognized by the Secretary of the Interior and eligible for funding and services from the United States. 89 Fed. Reg. 944, 946 (Jan. 8, 2024).

9.  Defendant UPR, an operating company of Union Pacific Corporation, operates in twenty-three states, including the State of Idaho. Union Pacific Corporation is incorporated in the State of Utah and its corporate mailing address is in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### A.   The Treaty of Fort Bridger

10.  Prior to European and American settlement in Idaho, Northern Shoshone and Bannock Indians—who spoke different but related languages—both inhabited the Snake River region and used the area subsequently known as the Fort Hall bottoms as hunting and winter camping grounds.

11.  After the arrival of British and American fur traders to the region in the early 1800s, a trading post called Fort Hall eventually was established near the junction of the Snake and Portneuf Rivers in 1834.

12. By the 1860s, permanent settlers and mining traffic began to arrive in southern Idaho, leading to calls that the Shoshone bands around Boise—the Boise and Bruneau bands—be placed on a reservation. By an executive order dated June 14, 1867, President Andrew Johnson created the Fort Hall Indian Reservation for the Boise and Bruneau bands. But the executive order said nothing about the Bannocks and Shoshones already living in the area around Fort Hall. Exec. Order of President Andrew Johnson (June 14, 1867), *reprinted in* 1 CHARLES J. KAPPLER, INDIAN AFFAIRS: LAWS AND TREATIES (1904).

13. Those Bannocks and Eastern Shoshone participated in treaty negotiations with the United States the following year. In the resulting treaty, the United States created a reservation for the Eastern Shoshone in Wyoming Territory and promised to set aside a reservation for the Bannocks whenever they so desired. Treaty of July 3, 1868, 15 Stat. 673 ("Treaty of Fort Bridger"), art. 2. The United States further promised that the Bannocks would have the "absolute and undisturbed use and occupation" of any future reservation "selected for them in their present country," with no unauthorized person ever being "permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians." *Id.*

14. To assure the Tribes' consent before any changes could be made to their property interests in the future, the Treaty provided that "[n]o treaty for the cession of any portion of the reservations . . . which may be held in common shall be of any force or validity against the said Indians, unless executed and signed by at least a majority of all the adult male Indians occupying or interested in the same . . . ." *Id.*, art. 11.

15. Consistent with the Treaty of Fort Bridger, an executive order dated July 30, 1869, designated the Fort Hall Reservation as the reservation for the Bannocks. Shoshones already living in the Fort Hall area were allowed to stay rather than be removed to the Eastern Shoshone

**Complaint – 4**

reservation in Wyoming, and small Shoshone groups living along the Snake River were persuaded to move to the Fort Hall Reservation. The original Fort Hall Reservation included much of southeastern Idaho, including the City. Exec. Order of President Ulysses Grant (July 30, 1869), *reprinted in* 1 CHARLES J. KAPPLER, INDIAN AFFAIRS: LAWS AND TREATIES (1904).

### B. The 1882 Act

16. Fort Hall lay at the intersection of key roads for settlers, miners, and developers, leading investors to see it as a good location for a rail line. In 1878, one of UPR's predecessors, the Utah and Northern Railway Company ("UNRC"), built a north-south rail line across the Fort Hall Reservation without securing proper permission from the Tribes or the United States, in violation of the Treaty of Fort Bridger. UNRC had obtained congressional authorization to build this line through public lands, *see* Act of Mar. 3, 1878, ch. 291, 17 Stat. 612; Act of June 20, 1878, ch. 362, 20 Stat. 241-42, but UNRC altered the route to go through the Reservation, to which the authorization did not extend. Congress would not act to correct this situation until 1888. Act of Sept. 1, 1888, ch. 936, 25 Stat. 452.

17. Meanwhile, the United States turned its attention to procuring land for an east-west rail line through the Fort Hall Reservation. Pursuant to June 1881 instructions from Secretary of Interior S.J. Kirkwood, Assistant Attorney General for the Interior Department Joseph K. McCammon traveled to Idaho to negotiate with the Tribes "for the extinguishment of title to so much of the said reservation as may be needed for the legitimate and necessary use of a railroad to be constructed through same by the [UNRC]." H.R. Doc. No. 47-18, at 5 (Jan. 11, 1882).

18. During preliminary negotiations, McCammon explained that the United States wanted the Tribes "to agree to sell a strip of land . . . to be used for a railroad track and depot grounds." *Id.* at 11. Should the Tribes consent, McCammon promised, "no land will be taken from them

**Complaint – 5**

except as much as is necessary for the right of way and station." *Id.* On July 18, 1881, having taken two weeks to survey the route, McCammon told the Tribes "[t]here are about seven hundred and seventy-five acres—to be exact, 772 acres—included within the lines of the road and the stations." *Id.* at 13. In consideration for their consent to the rail line, the Tribes agreed to McCammon's suggestion that they should receive $6,000.00. *Id.*

19. In the U.S. House of Representatives, the bill seeking to accept and ratify the 1881 Agreement with the Tribes was described as "a bill merely to give the right of way through the Fort Hall Indian reservation in Idaho, to the [UNRC], a branch of the [UPR] . . . ." 47 Cong. Rec. H2859 (daily ed. Apr. 13, 1882). Congress ratified the agreement verbatim. Act of July 3, 1882, ch. 268, 22 Stat. 148 ("1882 Act").

20. The 1881 Agreement, memorialized in section 1 of the 1882 Act, begins by defining the limited purpose of the cession:

> Whereas [UNRC] has applied for permission to construct a line of railroad from east to west through the Fort Hall Reservation, and [the Tribes] have consented thereto, and for that purpose have agreed, for the consideration hereinafter mentioned, to surrender to the United States their title to so much of land comprised in said reservation as may be necessary for the legitimate and practical uses of said road[.]

*Id.*, at § 1, 22 Stat. at 148.

21. The agreement goes on to describe the two categories of land that the Tribes agreed to cede to the United States, each to be used for a distinct and limited purpose: the first consisted of "[a] strip of land not exceeding one hundred feet in width (except at Pocatello Station, where it is two hundred feet) . . . the same being intended to be hereafter used . . . as a right of way and road bed"; and the second of "the several pieces or parcels of land situate along and adjoining the said

**Complaint – 6**

strip of land hereinbefore described . . . intended to be used . . . for depots, stations, sidings, and so forth . . . ." *Id.*, 22 Stat. at 148–49.

22. Affirming the distinct and limited purpose of each category, Congress specifically granted to UNRC "the right of way over the land relinquished by said agreement to the United States for the construction of said Utah and Northern Railroad, and the use of the several parcels of land so relinquished intended to be used for depots, stations, sidings, and so forth, for said railroad . . . ." *Id.* at § 3, 22 Stat. at 149.

23. The 1882 Act further affirmed the continuing vitality of the Treaty of Fort Bridger, providing that "[a]ll provisions of existing treaties not affected by this agreement"—which would include the Fort Bridger Treaty's promise of exclusive and "absolute and undisturbed use and occupation" of the Fort Hall Reservation—"[are] to remain in full force and effect." *Id.* at § 1, 22 Stat. at 149; *see* Treaty of Fort Bridger, 15 Stat. 673, at art. 2.

24. Within ninety days of the Act's enactment, the 1882 Act required that UNRC provide to the Secretary of the Interior "written acceptance of the conditions" of the Act and pay to the United States Treasury the $6,000.00 consideration agreed to between the Tribes and the United States. 1882 Act, § 3, 22 Stat. at 149.

25. In July 1882, UNRC gave formal acceptance of the 1882 Act's conditions to the Secretary of the Interior and tendered full payment to the Treasury Department.

26. Shortly thereafter, UNRC assigned its right of way to the Oregon Short Line ("OSL"), which constructed the east-west line across the Fort Hall Reservation in 1882. UNRC and OSL are predecessors in interest to UPR with respect to the rights granted in the 1882 Act for the construction and use of the east-west rail line across the Reservation.

**Complaint – 7**

## C. UPR's Misuse and Abandonment of the Railroad Right of Way

27. The 1882 Act granted UNRC parcels of land adjoining the rail right of way for "depots, stations, sidings, and so forth." *Id.*, at § 3, 22 Stat. at 149. One adjoining parcel, located in what is now central Pocatello, was designated the station grounds for the east-west line ("1882 Station Grounds"). (A map showing the 1882 Station Grounds is attached hereto as **Exhibit 1** and by reference incorporated herein.)

28. The east-west rail right of way no longer carries passengers, only freight, and the 1882 Station Grounds do not contain a station. UPR built an administrative building on a part of the station grounds. Early on, however, UPR also began authorizing uses of the 1882 Station Grounds to which the Tribes never agreed and Congress never authorized.

29. The United States is informed and believes, and on that basis alleges, that UPR began leasing part of the 1882 Station Grounds to the City for planting trees and beautification as early as 1936. The leases apparently began allowing for automobile parking on the Station Grounds in 1943, and UPR expanded the part of the Station Grounds leased to the City in 1953. For at least a short time in the 1950s, UPR permitted the City to install parking meters on the station grounds in exchange for monthly payments of $100.00.

30. According to a 1989 lease between UPR and the City, the City continues to use the 1882 Station Grounds "for parking and beautification and for other purposes incidental thereto"; maps attached to that lease appear to show that the City's use extends to a public dog park. The most current iteration of the lease, signed in 2000, is annually self-renewing and requires the City to pay $250.00 to UPR every 60 months.

31. The United States is informed and believes, and on that basis alleges, that another lease between UPR and the City—signed in 1999 for a 20-year term—allowed the City to

operate a "municipal bus system and parking area" within the 1882 Station Grounds. That lease, which superseded a prior lease of the same land, included an annual rate of $5,850 and an annual increase of 3%, subject to readjustment every five years. The bus system is a hub for the Pocatello Regional Transit, which operates urban and rural bus routes throughout southeast Idaho. This portion of the Station Grounds may also be, or may have been, used as a stop for Greyhound buses.

32. The United States is informed and believes, and on that basis alleges, that UPR began leasing another part of the 1882 Station Grounds for a federal credit union in 1976. Formerly known as the "Pocatello Railroad Employees Federal Credit Union" and the "Pocatello Railroad Federal Credit Union," the credit union currently goes by the name "Rails West Federal Credit Union." The building housing the Credit Union also houses a private law firm.

33. UPR's misuse and abandonment of the 1882 Station Grounds, as described in the foregoing paragraphs, has been and continues to be contrary to and in violation of the 1881 Agreement and 1882 Act.

## FIRST CLAIM FOR RELIEF
### (Declaration of Title)

34. The United States incorporates by reference its previous allegations as though fully set forth herein.

35. Pursuant to the 1881 Agreement and the 1882 Act, the Tribes granted UNRC, UPR's predecessor, an easement to use the 1882 Station Grounds only for railroad purposes.

36. Pursuant to the 1882 Act, the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, retains a reversionary interest in the 1882 Station Grounds should UPR at any time cease to use the 1882 Station Grounds, or some portion

thereof, pursuant to the limited easement granted in the 1881 Agreement and 1882 Act, for railroad purposes.

37. Since at least 1936, UPR has misused or abandoned its easement in the 1882 Station Grounds, or some portion thereof. Since that time, UPR's possession of the 1882 Station Grounds, or some portion thereof, has been wrongful and constitutes a trespass. UPR accordingly has deprived, and continues to deprive, the Tribes and the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, of the use, enjoyment, and occupancy of the Station Grounds, or some portion thereof, for the period of UPR's trespass.

38. The United States is entitled to an order declaring that UPR has misused or abandoned its easement in the 1882 Station Grounds, or some portion thereof, and that the United States thus holds title to the 1882 Station Grounds, or some portion thereof, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf.

## SECOND CLAIM FOR RELIEF
### (Ejectment)

39. The United States incorporates by reference its previous allegations as though fully set forth herein.

40. Since at least 1936, the possession of the 1882 Station Grounds, or some portion thereof, by UPR has been wrongful and constitutes a trespass. UPR accordingly has deprived the Tribes and the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, of the use, enjoyment, and occupancy of the Station Grounds, or some portion thereof, for the period of UPR's trespass.

41. UPR's continuing occupation of the 1882 Station Grounds, or some portion thereof, is unlawful and, as a direct and proximate result of that trespass, UPR has damaged and continues to damage the Tribes and the United States, in its capacity as trustee for the Tribes, or,

**Complaint – 10**

alternatively, on the United States' own behalf, and will continue to do so unless and until UPR is removed from the Station Grounds.

42. The United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, is entitled to an order ejecting UPR from the 1882 Station Grounds, or some portion thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

a. Declare that Congress, in the 1882 Act, granted only an easement in, rather than title to, the 1882 Station Grounds, to UPR and its predecessors in interest for use only for railroad purposes;

b. Declare that the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, retains, under the 1882 Act, a reversionary interest in the 1882 Station Grounds should UPR at any time cease to use those lands for railroad purposes;

c. Declare that UPR has ceased to use the 1882 Station Grounds, or some portion thereof, for railroad purposes;

d. Declare that UPR's right to use the 1882 Station Grounds, or some portion thereof, reverted to the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, under the 1882 Act, when UPR ceased to use the Station Grounds, or some portion thereof, for railroad purposes.

  e. Issue an order of ejectment to UPR and restore the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, to possession of the 1882 Station Grounds or the relevant portion thereof;

  f. Enter a judgment against UPR awarding mesne profits or monetary damages to the United States, in its capacity as trustee for the Tribes, or, alternatively, on the United States' own behalf, caused by UPR's misuse or abandonment of the 1882 Station Grounds or the relevant portion thereof, including, without limitation, administrative costs and the costs and expenses of restoring and remediating any damaged and degraded property;

  g. Enter a judgment for pre- and post-judgment interest on all damages awarded from the date of filing of this Complaint until the Judgment is paid in full;

  h. Award the United States all of its costs in this action to the maximum extent permissible; and

  i. Grant such other and further relief as the Court deems just and proper.

DATED: May 1, 2024

        Respectfully submitted,

        UNITED STATES OF AMERICA

        TODD KIM
        Assistant Attorney General
        Environment & Natural Resources Division

        By: /s/ Samuel D. Gollis
        SAMUEL D. GOLLIS, Trial Attorney
        CODY L.C. McBRIDE, Trial Attorney
        United States Department of Justice—ENRD
        Indian Resources Section

**Complaint – 12**